(No. 19227.—
THE LEROY STATE BANK, Defendant in Error, *vs.*
J. KEENAN'S BANK *et al.* Plaintiffs in Error.

*Opinion filed October 19, 1929—Rehearing denied Dec. 17, 1929.*

HERRICK & HERRICK, ADLAI H. RUST, and STONE & TAYLOR, for plaintiffs in error.

W. W. WHITMORE, and SIGMUND LIVINGSTON, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

The LeRoy State Bank recovered a judgment in an action of assumpsit in the circuit court of McLean county against L. C. Keenan and others for $75,120.91, which the

Appellate Court affirmed, and upon the petition of the defendants a writ of *certiorari* was awarded for the purpose of reviewing the record.

The lawsuit and the agreement on which it was based had their origin in the failure, early in January, 1924, of J. Keenan's Bank, a banking corporation organized under the laws of the State of Illinois, doing business in the city of LeRoy. On January 9 the Auditor of Public Accounts having been satisfied by an examination that the bank was not in safe condition to continue the banking business, closed it and took charge of its assets. It was never re-opened for the transaction of banking business. The LeRoy State Bank was organized for the purpose of doing a banking business in the city of LeRoy and taking over the assets and business of J. Keenan's Bank. For that purpose a tripartite contract was entered into on January 25, 1924, in which the LeRoy State Bank was the party of the first part, J. Keenan's Bank the party of the second part, and A. J. Keenan, L. C. Keenan, R. H. Roadman, D. F. Vandeventer, E. E. Sargent, C. J. Null, Hugo Pfitzenmeyer and Frank C. Barley, the eight directors of the latter bank in their respective individual capacities, parties of the third part, as follows:

"Memorandum of agreement entered into this 25th day of January, A. D. 1924, by and between the LeRoy State Bank of LeRoy, Illinois, party of the first part, and J. Keenan's Bank of LeRoy, Illinois, party of the second part, each of said parties being banking corporations, and A. Jay Keenan, L. C. Keenan, R. H. Roadman, D. F. Vandeventer, E. E. Sargent, C. J. Null, Hugo Pfitzenmeyer and Frank C. Barley, who now constitute the board of directors of the J. Keenan's Bank and who in this instrument contract as individuals, parties of the third part:

"Witnesseth: That the party of the first part agrees to assume, and does hereby assume, all liabilities of the party of the second part except its liability to its stockholders,

which said liability assumed is shown by schedules hereunto attached numbered 1 to 6, inclusive, and made a part of this agreement. As a part of said liabilities assumed shall be included interest upon such items up until the 25th day of January, 1924, in so far as the same shall be paid by the party of the first part.

"Party of the second part agrees to transfer, and does hereby transfer, assign and set over, all of the assets of the said J. Keenan's Bank, said assets being shown by exhibits hereunto attached and numbered 1 to 17, inclusive, and does agree to transfer by a good and sufficient warranty deed executed by the president and cashier of said bank under the authority of a resolution of the board of directors of the said second party, the real estate of said second party as shown in exhibit attached, the title to the same to be free and clear from encumbrances as shown by an abstract brought down to date, except taxes for the year 1923, which said first party agrees to pay and deduct from the purchase price of said building as hereinafter set forth, and party-wall agreements, if any.

"Parties of the third part, in consideration of the covenants and agreements of the party of the first part and party of the second part as above set forth, do hereby covenant for themselves that they will, and do hereby, fully guarantee the said party of the first part that the said assets so taken by it from said party of the second part shall be sufficient to liquidate the liability assumed by the said party of the first part.

"Parties of the third part further covenant with party of the first part that said guaranty shall extend for a period of three (3) years, or such part thereof as may be necessary in order to enable the said party of the first part to liquidate the assets turned over to them to the extent that may be required to fully satisfy the liability assumed by the said party of the first part.

"It is further understood by all of the parties hereto that the said first party shall have the right from time to time during the period of said guaranty to renew any or all bills receivable specified in said schedule, and that such renewal shall not operate to release or in any way discharge the guaranty of the parties of the third part, and upon its part in this connection the party of the first part agrees that the parties of the third part shall have the right from time to time to make inquiry with reference to the bills receivable so turned over and as to progress made in their collection, and shall from time to time consult with the party of the first part with reference to the best methods of retiring the same; and the party of the first part further agrees that it will use its best efforts to collect and retire said paper in the usual course of business, to the end that the parties of the third part may as soon as possible be relieved from the guaranty thereon.

"With this end in view it is further agreed that the said J. Keenan's Bank shall nominate and appoint one representative to act upon their behalf in this connection, and that in the event the result of the consultation between the parties shall be that they disagree as to the advisability of forcing collection upon any bills receivable, that question shall be submitted to the Auditor of the State of Illinois, whose determination of the question shall be final.

"It is further understood and agreed that the said party of the first part shall open upon the books of the LeRoy State Bank an account to be known as the 'J. Keenan's Bank Account,' wherein shall be credited upon the one side the assets so turned over by said J. Keenan's Bank to the said first party, and be charged upon the other side with the amount of liabilities assumed by the said party of the first part as hereinabove set forth, and that from time to time as said bills receivable, or any part thereof, are collected, together with the interest upon the same up until the

25th day of January, 1924, or shall be renewed to the satisfaction of the party of the first part, the same shall be credited to the account of the said J. Keenan's Bank upon said account, and that in said account there shall be at once credited to the said J. Keenan's Bank the building, furniture, fixtures and supplies at the fixed sum of forty thousand dollars, ($40,000,) less the amount of taxes assumed, as hereinabove specified.

"It is further understood that whenever the sums collected from said assets, together with the fixed amount allowed for said building as aforesaid, shall equal the liabilities assumed, that the guaranty of the parties of the third part shall be automatically discharged and the party of the first part shall turn over to the said second party any remaining assets so scheduled, with the option upon the part of the party of the first part to retain any part thereof at the full face value or to retain any part upon an agreed valuation.

"It is further agreed that at the expiration of the said three-year period of guaranty, if the assets turned over by the party of the second part to the party of the first part shall not have sooner liquidated the liability as shown by the account above provided for, that the said parties of the third part will upon demand withdraw from said party of the first part, under the terms and conditions above provided, the remaining assets charged to the Keenan account and will forthwith pay in cash the sum of money necessary to liquidate the said liabilities assumed by the party of the first part.

"It is further understood and agreed that in event it shall be necessary for the party of the first part, during the term of this guaranty, to expend any sums of money for the protection of any of the assets turned over by the party of the second part, that the sums of money so expended shall be charged against the account of the said party of the second part above provided for.

"This agreement is executed in duplicate, the day and year first above written, by the said parties of the first part and second part by their respective presidents and cashiers, and by the parties of the third part in person, the parties of the first and second parts having been heretofore duly authorized to execute the same by action of the board of directors of the respective banks."

Attached to this contract were the seventeen schedules referred to in it showing the assets and liabilities of J. Keenan's Bank. The assets were shown to be $541,476.71, consisting of loans and discounts, $402,405.41; loans secured by real estate mortgages, $61,641.26; overdrafts, $738.53; bonds, $10,000; banking house, $26,500; furniture and fixtures, $25,000; cash and exchange, $8917.96; real estate account, (book account,) $6273.55. The liabilities were shown to be $450,109.58, consisting of checking accounts, $216,665.59; demand certificates of deposit, $7999.83; interest-bearing certificates, $107,095.43; cashier's checks, $330.73; dividend checks, $18; bills payable, $118,000.

The Auditor turned over the assets of the Keenan Bank, in accordance with the written contract, to the LeRoy State Bank, which proceeded to collect them and paid all the liabilities of the Keenan Bank. It accepted the deed conveying the bank building to it and credited the Keenan Bank with $40,000, representing the value of the bank building, furniture, fixtures and supplies as mentioned in the contract. After the expiration of the three years upon which the parties of the third part agreed that if the assets of the Keenan Bank taken over by the State Bank should not have liquidated the liability assumed by the State Bank, they would, upon demand, withdraw the remaining assets charged to the Keenan account and pay in cash the sum necessary to liquidate the liability assumed by the State Bank, the latter bank on January 26, 1927, brought suit

for the amount of the deficit, which was alleged to be $124,453.94.

The first question which presents itself in the consideration of the case is the nature of the obligation assumed by the various parties to the contract. The party of the first part, the LeRoy State Bank, assumed and undertook to pay all the liabilities of the party of the second part except its liability to its stockholders, including interest to January 25, 1924, and to use its best efforts to collect and retire the paper due the Keenan Bank in the usual course of business, to the end that the parties of the third part, the individual guarantors, should be relieved as soon as possible from their guaranty of it. It further agreed that the parties of the third part should have the right from time to time to make inquiry with reference to the bills receivable so turned over and the progress made in their collection and should from time to time consult with the LeRoy State Bank with reference to the best methods of retiring them, and it was further agreed that the Keenan Bank should nominate and appoint a representative to act upon their behalf, and in the event the result of the consultation between the parties should be that they disagreed as to the advisability of forcing collection upon bills receivable, that question should be submitted to the Auditor of the State, whose determination of the question should be final. It further agreed to open upon its books an account to be known as the "J. Keenan's Bank Account," wherein should be credited the assets turned over by that bank to the LeRoy Bank and charged the amount of liabilities assumed by the LeRoy Bank, and from time to time, as the bills receivable were collected or renewed to the satisfaction of the LeRoy Bank, the amounts received should be credited to the Keenan Bank account, the bank building, furniture, fixtures and supplies to be credited at once to that account at $40,000, less the taxes for 1923. It further agreed that whenever the sums collected from the assets of the Keenan

Bank, together with the amount allowed for the building, should equal the liabilities assumed, the guaranty of the parties of the third part should be automatically discharged and it would turn over to the Keenan Bank any remaining assets scheduled, with the option on the part of the LeRoy Bank to retain any part of such assets at the full face value or upon an agreed valuation. The Keenan Bank agreed to assign and transfer all of its assets to the LeRoy Bank and convey to it its banking house, furniture and fixtures by a title free and clear of encumbrances except taxes for the year 1923, which the LeRoy Bank agreed to pay and deduct from the purchase price of the building. The individuals constituting the parties of the third part agreed that they would fully guarantee the LeRoy Bank that the assets taken by it from the Keenan Bank should be sufficient to liquidate the liability assumed by the LeRoy Bank; that such guaranty should extend for a period of three years, or such part thereof as might be necessary to enable the LeRoy Bank to liquidate the assets turned over to it to the extent that should be required to satisfy the liability assumed. It was further agreed by all the parties that the LeRoy Bank should have the right to renew any or all bills receivable specified in the schedule, and such renewal should not operate to release or in any way discharge the guaranty of the parties of the third part. It was further agreed that in the event it should be necessary for the LeRoy Bank, during the term of the guaranty, to expend any sums of money for the protection of any of the assets turned over by the Keenan Bank, such sums of money should be charged against the account of the Keenan Bank provided for in the contract.

The plaintiffs in error contend that by this contract it was intended that the LeRoy Bank was to become the purchaser of all the assets of the Keenan Bank and assume all its liabilities, that the latter should have no further responsibility, and that the contract of the parties of the third

part was a guaranty that the assets would be sufficient to pay the liabilities assumed and was merely a guaranty of the collectibility of the assets. This, however, was not the whole of the contract of guaranty. Paragraph 5 provided that the guaranty should extend for a period of three years, or such part thereof as might be necessary to enable the LeRoy Bank to liquidate the assets turned over to it to the extent that might be required to fully satisfy the liability assumed by the bank. By paragraph 10 it was provided that at the expiration of the three-year period mentioned in paragraph 5 the guarantors would upon demand, if the assets turned over to the LeRoy Bank should not sooner have liquidated the liability, withdraw from the LeRoy Bank the remaining assets and would forthwith pay in cash the amount of money necessary to liquidate the liabilities. Whatever may have been the title taken to these assets by the LeRoy Bank, it is clear that it was subject to the right of the Keenan Bank to an accounting of the assets and liabilities and to receive all the remainder of the assets as soon as the amount collected, together with the fixed amount allowed for the banking building, was equal to the liabilities assumed. The LeRoy Bank agreed to use its best efforts to collect and retire the assets in the usual course of business and to keep the account in the form required by paragraph 8 of the contract. The guaranty of the parties of the third part was to pay the liabilities of the Keenan Bank assumed by the LeRoy Bank unpaid at the end of three years if the assets turned over to the latter bank had not before that time paid the whole liability. The promise was an absolute promise to pay the liabilities at the end of three years if the assets had not paid them. A guarantor may impose any terms or conditions on his guaranty which he may choose and will only be liable according to the terms of the agreement. If he guarantees payment unconditionally and payment is not made then he is liable on his guaranty. *Illinois Surety Co.* v. *Munro,* 289 Ill. 570; *Sto-*

*well* v. *Raymond,* 83 id. 120; *Parkhurst* v. *Vail,* 73 id. 343; *Heaton* v. *Hulburt,* 3 Scam. 489; *Pfaelzer* v. *Kau,* 207 id. 116.

It is contended by the plaintiffs in error that they were guarantors only that the assets delivered to the LeRoy Bank would be sufficient to equal the amount of liabilities assumed if they were converted into cash and collected within three years. That, however, was not the whole contract. They also agreed if the assets did not equal the liabilities within the time stated, as shown by the account provided for, they would pay the deficiency. It is argued that keeping the account and proceeding to collect were conditions precedent to payment by the guarantors. The essentials of the contract were the transfer of the assets, the best efforts of the bank to collect in the usual course of business, and the promise to pay at the end of three years if the assets did not pay the liabilities. The form of the account was not essential and was not made a condition precedent to liability of the guarantors. The language referring to the account was not used in connection with the guaranty or agreement to withdraw the uncollected assets upon demand and pay the deficiency for the payment of the liabilities. It was used only in the paragraph which authorized the LeRoy Bank to renew bills receivable without releasing the guaranty, in which the bank agreed that the parties of the third part should have the right to consult with the party of the first part with reference to the best method of retiring the bills receivable and that the bank would use its best efforts to collect and retire the bills receivable in the usual course of business. There was no suggestion of making this agreement a condition precedent to the binding effect of the guaranty.

It is contended that the defendant in error did not comply with the agreement to "use its best efforts to collect and retire said paper in the usual course of business." The burden of proving the breach of this agreement and consequent

damage was upon the plaintiffs in error. The plaintiffs in error rely upon two examples to show the failure of the defendant in error to use its best efforts to collect. The first is two items which appear in the schedule of loans secured by real estate mortgages in the name of Albert G. Bailey and Alice H. Bailey, amounting to $6327.40. In fact there was no such loan. Such a loan had existed, but the mortgage securing it had been foreclosed and the title to the mortgaged premises of 140 acres vested in the Keenan Bank by a master's deed two months before January 25, 1924. The land was not mentioned in the contract and is not included in the agreement of the defendant in error to use its best efforts to collect. The only real estate to be conveyed to the defendant in error in contemplation of the contract was the banking house, and the defendant in error refused to accept a conveyance of the Bailey land. The other example is five notes of F. M. Crosson, for the aggregate amount of $3385 and interest. The evidence in regard to these notes is, that after the defendant in error had taken a judgment in Colorado against the makers it received a tentative proposition from the First National Bank of Utah, Colorado, to pay half the amount of the judgment for it,—that is, a letter saying that it would consider fifty cents on the dollar. The cashier of the defendant in error talked the matter over with Mr. Smith, who was a director in both the Keenan Bank and the LeRoy Bank. Smith "went to them about it" but no settlement was made. Here the evidence leaves the matter. Why no settlement was made does not appear. The evidence does not show any positive offer of fifty cents on the dollar, or that the failure to make the settlement or realize anything on the judgment was the result of neglect or lack of effort on the part of the defendant in error. The plaintiffs in error refer in their brief to a number of other items which they say were accorded similar treatment by the defendant in error, which, in order to save space, they will not de-

tail, as those discussed indicate the defendant in error's treatment of some of the assets. Since they thus rest their case on their charge against the defendant in error of failure to use its best efforts to collect on the two items which they have discussed in detail and which we do not find sufficient to sustain the charge, we do not regard it as required of us to examine the abstract for the details of the other instances of similar treatment to which reference is made in the brief.

It is contended that the keeping by the defendant in error of the account provided for by the contract was essential to its right to recover on the contract. This account, the defendant in error agreed, should be opened upon its books, and should be credited on the one side with the assets turned over to it by the Keenan Bank and charged on the other with the amount of liabilities assumed by the LeRoy Bank, "and that from time to time as said bills receivable, or any part thereof, are collected, together with the interest upon the same up until the 25th day of January, 1924, or shall be renewed to the satisfaction of the party of the first part, the same shall be credited to the account of the said J. Keenan's Bank upon said account, and that in said account there shall be at once credited to the said J. Keenan's Bank the building, furniture, fixtures and supplies at the fixed sum of forty thousand dollars, ($40,000,) less the amount of taxes assumed as hereinabove specified." The Appellate Court regarded the contract as requiring this account at once upon its opening to be credited with all the assets turned over by the Keenan Bank to the defendant in error and charged with the amount of liabilities assumed by the defendant in error, and to be credited thereafter, as the bills receivable should be collected or renewed, with the amounts so collected or bills renewed, the building, furniture, fixtures and supplies to be credited at once at the fixed sum of $40,000, less the taxes assumed. It therefore held that in the account so

kept. there would be a doubling or trebling of credits by reason of the crediting of all the assets at the opening of the account and afterward crediting the various items separately, as they were collected or renewed. This, we think, is not the real meaning of the language when the whole paragraph is construed together. All the assets turned over are to be credited upon one side of the account and all the liabilities charged on the other, but the contract does not say that all the charges and credits shall be made at once. The charge of the liabilities might well be made at once, for their amount was fixed by the schedules attached to the contract. Since the assets were to be collected and not be applied to the reduction of the liabilities until reduced to cash, it was therefore provided that as the bills receivable should be collected from time to time or renewed to the satisfaction of the defendant in error they should be credited to the account. The credit for the building having been fixed was not subject to variation, and it was therefore agreed that it should be credited at once. The paragraph is rather inaptly expressed, and the misunderstanding of its meaning has arisen from a consideration of the opening general undertaking that the party of the first part shall open an account wherein shall be credited upon the one side the assets turned over and charged on the other the liabilities assumed, without taking into account the subsequent particular statement that the bills receivable shall be charged to the account as they are collected from time to time. The paragraph amounts to no more than an agreement of the defendant in error to keep on its books a complete and separate account of its transactions in regard to the contract, showing on one side the liabilities assumed and on the other the bank building at the price agreed upon and the assets as they are collected or renewed from time to time. A compliance with this agreement was not expressly required in the contract as a condition precedent to the liability of the plaintiffs in error on their guaranty,

and it cannot be implied. In the case of *Niagara Fire Ins. Co.* v. *Forehand,* 169 Ill. 626, upon which the plaintiffs in error rely, it was held that a provision of a fire insurance policy upon a stock of goods that the insured shall take inventories and keep correct books showing purchases and sales and keep the inventories and books in a place secure from fire when the store is closed, under penalty of forfeiture, is a reasonable provision which an insurance company has a right to require, and that a failure to comply with the provision was a defense to an action on the policy. In that case, however, there was an express provision that failure to observe the condition should work a forfeiture of all claims under the policy.

On the trial the president of the LeRoy Bank identified the contract, together with the schedules and exhibits attached to it. The cashier testified to the bills receivable of the Keenan Bank which remained uncollected, amounting to $103,646.14 of principal. He also identified a number of the books of the bank, being exhibits A-19, A-20, A-21, A-22 and A-23. A-19 he said was a daily blotter, a book of the bank kept in due course of business, and original entries were made in that book as they appear. He kept this book since he had been there. The recitals therein were correct as near as he knew. A-20 was a book in which various credits due to the Keenan Bank were given under the various charges. It represented the accounts of the LeRoy Bank with the Keenan Bank. It was called a miscellaneous account, and a copy of the checking account was there and other charges. They were made in the last year and a half. It represented the last year and a half. The book itself was not made up until the last year and a half of the contract. It was taken off of other books of original entry and put into one book for convenience. The entries therein were correct as far as he knew. Exhibit A-21 was a daily blotter continuing exhibit A-20. It was kept in the due course of business, entries made from

day to day as they occurred and was correct as far as the cashier knew. It was not kept by him in all cases but by someone in the bank. If he was not in the bank the assistant cashier kept it, under his orders. He ordered the assistant cashier. The cashier's entries were also in it. If he was not in the bank one of the other employees made the entries. Exhibit A-22 was a general ledger kept in due course of business by the cashier and the assistant cashier, and the entries therein were correct to the best of the cashier's recollection and knowledge. Exhibit A-23 was a book in which appeared the general bank balance. The accounts of all the customers of the bank were in these books. These various exhibits were the general books of the bank showing its accounts with all its customers. None of these books were received in evidence. They were offered in evidence but were objected to by counsel for the defendants on the ground, among others, that no proper or sufficient foundation had been laid for their introduction, that none of the accounts shown were with the defendants, that they were not trade books or such books as under the law were entitled to admission in evidence. The objection was sustained and no cross-errors on the ruling have been assigned by the defendant in error.

The defendant in error called as a witness U. J. Albertsen, of Pekin, Illinois, who testified that he was an accountant employed by Gilbert Geiger, a public certified accountant having his office in Peoria; that he examined the books of the LeRoy State Bank for the purpose of making an audit of the account of that bank with the Keenan Bank, beginning work in December, 1926. He utilized the account books of the bank, the general ledger, the day-book and subsidiary ledger, (which was known as the checking account,) depositors' accounts of the Keenan Bank, and others. He did not recollect what the names of the books were, but they all had an effect on the account with respect to the assets and liabilities that were taken over on Janu-

ary 25, 1924. He had copies of the notes that remain unpaid but not the original notes. Some of them were in judgment and were filed in Bloomington. He was at LeRoy eight or ten days and made work sheets from the books on each item, which he took to the office of Geiger and worked upon there for approximately ten days. He made a correct accounting according to the records he found at LeRoy. He had a schedule of the bills receivable as of January 25, 1924, showing the original list of bills taken over by the LeRoy Bank. The total amount of the bills receivable taken over was $402,415.41. He said he found an error of $10 and corrected that in his accounting. He had the dates of all payments made on all the notes that were in the contract, and the dates and the amount are shown on his work sheet. This was as shown by the books of the bank, and also shows the balance unpaid on each of these items. He brought them down to January 25, 1927. His record shows the balance of these items unpaid at that date was $112,989.07 of principal. The work sheet showed the unpaid balance of loans and discounts in the principal amount of $103,646.14, and the real estate loans $60,201.09, a total of $163,847.23. The interest charged, which appeared upon the books of the Keenan Bank, was excluded in the audit of the account and the interest figured individually from the original source. The figures that the LeRoy Bank officers or clerks made on the interest were excluded. The audit was prepared and completed by the witness and Geiger from these work sheets, and the figures showed the amount adjusted up to the date April 26, 1927, $112,521.60. On cross-examination the witness said that he did not pay any attention to the way the contract provided to figure the account and made no attempt to figure according to the contract. He worked with the schedule of the original notes, which he took from the contract. He saw the schedules. There was no contract attached. He could not say whether the schedules were a part of the

contract or ever attached to the contract. He took the list of notes from the schedules. They were on the books at one time. He did not take the items off the books. He took them off a typewritten schedule. He took into account the general ledger and day-book of the bank, which showed the payments. He used the bills receivable account in the books of the LeRoy State Bank, which shows the total that makes up these different notes in the list. He took into account the loans and discounts account transferred from the Keenan Bank as shown by the books, and the J. Keenan checking account, which was afterward called something else—called by three or four different names at different times. He used some loose sheets of the checking account marked "J. Keenan Bank Entries," called trays. They were called "Depositors' Ledger" and are in looseleaf form. He used the memorandum account which the cashier used to substantiate items that go in and out of that account. Exhibit A-20 is a memorandum account which the cashier told the witness he made some year and a half after entries were made in the original book, and the witness checked them back from that book—checked them back against loose sheets that have not been identified. He used the time certificate account. He did not use the certificates. He took the time certificate account from the schedules.

Gilbert B. Geiger testified that he is a certified accountant of twenty-seven years' experience. He was employed to audit the account of the LeRoy State Bank with the Keenan Bank and personally did part of the work, reviewing the work sheets of Albertsen, to whom the detail of the assignment was made, and supervising and assisting in making all computations with respect to interest. He examined all the books of the LeRoy State Bank that were present at the trial, and used some, but not all, of them. He did the final drafting of the account, and the final statement represents the findings taken from the work sheets

prepared from the original records of the bank. He had a copy of the contract and the detailed schedules of the assets and liabilities that were prepared at the time the transfer was made, and from all these things and the work sheets he used he determined the correct amount in final figures as to the status of that account. The net deficit as determined was $79,431.51.

When these expert accountants testified the books of the bank on which their audit was based had not been offered in evidence. Objection was made to their testifying because no proper and sufficient foundation had been laid, because the records were not in evidence, because the questions asked permitted the witness to put his own construction on the contract and state the account accordingly, and because the contract specified how the account should be kept, but the objections were overruled and the witnesses permitted to testify. When the books were later offered in evidence an objection to their admission was sustained, as has been stated.

While the material contents of an existing book of original entry which is obtainable cannot be proved by parol testimony, because the book is the best evidence, yet where the originals consist of numerous documents, books, papers or records which cannot conveniently be examined in court and the fact to be proved is the general result of the whole collection, any competent witness who has examined the originals may testify as to such result, provided it is capable of being ascertained by calculation. (*Inter-State Finance Corp.* v. *Commercial Jewelry Co.* 280 Ill. 116; *People* v. *Gerold,* 265 id. 448.) It is in the discretion of the court to admit such statements or schedules of figures or the results of the examination of numerous documents or account books to be introduced in evidence, such statements, schedules or results to be verified by the testimony of the witness by whom they were prepared, allowing the adverse party an opportunity to examine them before they are ad-

mitted in evidence and to examine the witness from the original books, where such books are accessible. (*People* v. *Sawhill,* 299 Ill. 393.) While the results of the examination of voluminous documents, writings, records and books may be proved by expert accountants or other competent person who has made the examination, the documents, records or books upon which the examination is based must be of such a character as to be themselves admissible in evidence. The oral evidence is admissible because the voluminous character of the instruments of evidence precludes their examination in court, and the testimony to results reached by their examination is merely a statement of what those instruments show. It was therefore necessary that the books and papers which the expert accountants examined should themselves have been competent evidence. In order to render an account book admissible in evidence it is essential that proof as satisfactory as the transactions are under the circumstances reasonably susceptible of, shall be given that the entries made are correctly recorded. (*People* v. *Small,* 319 Ill. 437; *Chisholm* v. *Beaman Machine Co.* 160 id. 101; *House* v. *Beak,* 141 id. 290.) Where the testimony of a witness who made the entries is not available it is competent to establish the authenticity of the book by other evidence. The only evidence produced of the authenticity of the books which the accountants examined is the testimony of the cashier of the LeRoy Bank. He did not become cashier until three months after the making of the contract and the transfer of the assets to that bank. He did not make all the entries in the books. He did not testify, and could not testify, to the correctness of all those entries. Entries were made by the assistant cashier and other persons whose names were mentioned in the cashier's testimony, but they were not called to show that the entries were correctly made, and there was no testimony that they were not available. Exhibit A-20,

which was used in reaching the results arrived at by the accountants, was in large part not a book of original entry, but was, so far as more than half of the period which it purported to cover was concerned, copied from other books to whose authenticity and correctness no one testified. For these reasons the books were not admitted in evidence. The conclusions of the accountants, however, based on these books, which were not so verified as to make them competent evidence, were received and were made the basis of the judgment which was rendered. The court instructed the jury, in determining the amount the plaintiff was entitled to recover, to consider its entire claim to be $79,825.70, which Geiger testified was the corrected amount of the deficit due from the defendants on April 26, 1927. Since the books were not shown to be competent evidence the statement of the conclusions reached by a consideration of them was not competent evidence and should not have been admitted.

Judgment was rendered against all the defendants, including L. C. Keenan and A. J. Keenan. L. C. Keenan demurred to the declaration, the demurrer was overruled, and without any order upon him to plead, and without default entered against him, the cause proceeded to trial with counsel appearing for all defendants on whose behalf objections were made from time to time by counsel, who were the same counsel who represented him in filing the demurrer. Where a party to a suit at law goes to trial the same as though the case were at issue, although the only pleadings are the declaration and a general and special demurrer, which are undisposed of and upon which no issue is joined, the error is waived, and the objection cannot be raised for the first time in a court of review. (*Devine* v. *Chicago City Railway Co.* 237 Ill. 278.) There is the same reason where a party having filed a demurrer which has been overruled goes to trial without filing any plea, the same as though

194

the case were at issue, should be regarded as waiving the error.

For the error in admitting the testimony of the experts as to the result of their examination of the books of the defendant in error the judgments of the Appellate Court and of the circuit court are reversed and the cause is remanded to the circuit court.  *Reversed and remanded.*