In the Matter of SHELLEY FURNI-
TURE, INC., Bankrupt.

EXCHANGE NATIONAL BANK OF
CHICAGO, Appellant,

v.

Francis J. CURTIS, Trustee, Appellee.

No. 12965.

United States Court of Appeals
Seventh Circuit.

Oct. 31, 1960.

Lawrence J. West, James B. Egan, Chicago, Ill., for appellant.

Louis I. Kessler, Joseph L. Kadison, Chicago, Ill., for appellee.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

On February 21, 1955, an involuntary petition in bankruptcy was filed against Shelley Furniture, Inc. On April 10, 1956, the Trustee in Bankruptcy petitioned the Referee in Bankruptcy to set aside an assignment, made by the Bankrupt on October 30, 1954, to The Exchange National Bank of Chicago. This assignment transferred to the Bank three fire insurance policies and claims thereunder amounting to $50,000. It was alleged that the assignment constituted a voidable preference. The Referee sustained the petition without prejudice to the Bank's right to participate in distribution as a general creditor. On petition to review the Referee's decision, the District Court approved and confirmed the Referee's order. The Bank appealed.

The Bankrupt, Shelley Furniture, Inc., was organized in March, 1954, by Dave Segal, a retail furniture merchant. The Bankrupt corporation operated two retail stores in Chicago, Illinois. One had been opened in March, 1954, and the other in July, 1954. The second store was substantially destroyed by fire on October 16, 1954. The other store continued in operation until the bankruptcy. Shelley Furniture opened a commercial checking account with the Exchange Bank on April 28, 1954, with an initial deposit of $25,000. The Bank made three loans to Shelley as follows: May 17, 1954—$10,000; May 24, 1954—$5,000; and August 2, 1954—$4,000. None have been paid. Shelley's total capital was $10,000, which was represented by 100 shares of capital stock owned by Mr. Segal and his wife, who advanced additional sums in excess of $85,000 in the form of loans to Shelley. These were subordinated to the Bank's claims. The Bank's May 17th loan for $10,000 was personally guaranteed by the Segals. It was due in 90 days, was not paid at maturity and was renewed to October 15, 1954. The May 24th loan for $5,000, also personally guaranteed by the Segals, was not paid at maturity and was renewed August 23, 1954. On June 4, 1954, the Bank lent $10,000 to Mr. Segal personally, payable September 4, 1954. This loan was not paid at maturity. On August 2, 1954, the Bank lent $4,000 to Shelley which was overdrawn $3,627.44 in its account on the previous day. The Bank's records disclose that this loan was to meet a temporary need and was to be paid at maturity. It was renewed for 30 and 90 days, respectively, and was not paid at either maturity date. On October

30, 1954, after the fire on October 16, 1954, had destroyed the entire stock in the second store, Shelley assigned to the Bank the $50,000 worth of fire insurance carried on that store. Except for one small account, the Exchange Bank was Shelley's only banking connection. The monthly bank statements reflect numerous overdrafts printed in red. The Bank argues that these were mere bookkeeping overdrafts resulting from banking practice of daily debiting the account with withdrawals first, and then, later in the day, crediting deposits. Nevertheless the overdrafts do suggest that Shelley was constantly in difficulties with its bank balance. An examination of the Bank's statements over the period in question creates a serious doubt as to whether or not Shelley ever had the ability to pay the loans individually or collectively.

The Bank contends that the proof adduced by the Trustee failed to establish that Shelley was insolvent on October 30, 1954, when the assignments were executed, or that the Bank (1) had knowledge of insolvency, or of such facts as would be tantamount to knowledge of insolvency; or (2) had reasonable cause to believe that Shelley was insolvent.

The Bank argues that the Referee's findings as affirmed by the District Court, are entitled to little weight as they are based in large part on documentary exhibits, and Mr. Segal's deposition taken outside the presence of the Referee. The Bank also contends that the testimony of the Shelley accountant to the effect that Shelley was insolvent on October 30, 1954, and his audit reports of October 16th and 18th, 1954, were improperly admitted into evidence. In support of this contention, the Bank argues that the books and records from which the audits were prepared and on which the accountant's testimony was predicated, were neither offered nor received in evidence; that all the books and records were not produced in Court; and that the accountant relied on other information not contained in the books and records. The

accountant explained some of his figures as being based on, or verified by, Shelley's minute book, claims and schedules filed in the bankruptcy proceedings, notes and conversations with Mr. Segal. All this material was in evidence. The accountant was not a mere expert witness making a summary from documents supplied by others. He was Shelley's own accountant, who had kept the Bankrupt's books and records, and who testified to facts within his own knowledge as to Shelley's continuous financial record. He was a witness familiar with the contents of Shelley's voluminous records and competent to testify to a summary of those records, all of which were accessible to the Bank. Many were produced in Court. It does not appear that the Bank asked for the production of any of the other records, such as purchase invoices and unpaid bills, which the Bank now contends should have been brought into Court, although counsel for the Bank did use such of the books and records as had been produced in Court, in the course of cross-examining the Shelley accountant. Counsel for the Trustee had the actual purchase invoices, which were described as so voluminous as to require transport by truck, and offered to make them available if counsel for the Bank wished to see them. In this case, the Trustee was not seeking to prove the precise amount of a specific claim, but only the issue of insolvency. It was unnecessary to show the exact amount by which Shelley was insolvent. Abdo v. Townshend, 4 Cir., 1922, 282 F. 476. For example Shelley's audit as of October 16th, the Trustee's Exhibit # 4, shows Shelley to be solvent by $1,700.89. In that audit, the inventory, in the store where the fire occurred, was listed as worth $53,458.09, valued apparently at cost. In the later audit made to reflect Shelley's position on October 18th, the Trustee's Exhibit # 6, the same inventory was listed at $37,500, the amount of the Trustee's settlement with the insurance company. The Bank contends that this figure of $37,500, which was unknown as of October 18, 1954, should not have been used to show that Shelley was insolvent as of October 18,

1954. We agree. However, even if we restate the inventory at the figure of $53,458.09, Shelley will still be shown to be insolvent.[1]  The October 16th audit

1. The audit as of October 16, 1954, showed current liabilities as follows:

"Bank overdraft  $ 2,494.54
Notes payable, bank  29,000.00
Accounts payable ***  43,907.04
Accrued taxes  320.50
Customers' deposits ***  1,679.81

Total current liabilities  $ 77,401.89"

The audit as of October 18, 1954, showed current liabilities as follows:

"Bank overdraft, Exchange
National Bank  $ 2,494.54
Notes payable:
Exchange National Bank  $19,000.00
Jack Holt  10,000.00
Louis Nelson  2,500.00
Garmen Building Corp.  18,040.00
Florence Segal  10,000.00  59,540.00

Accounts payable ***  43,907.04
Accrued taxes  320.50
Accrued expenses  1,250.00
Customers' deposits ***  1,679.81

Total current liabilities  $109,191.89"

failed to reflect liabilities of about $30,000. Further, it made no allowances for such items as depreciation on the inventory or losses in accounts receivable. In re United Finance Corp., 7 Cir., 1939, 104 F.2d 593, 598–9; Security-First National Bank v. Quittner, 9 Cir., 1949, 176 F.2d 997, 999.

Where a witness who is familiar with the contents of voluminous records testified to the general result of examination by a summary of their contents, the entire mass of the records themselves need not be admitted in evidence, where the records are available and can be made accessible to the opposing party for inspection, if desired, and for use in cross-examination. Wigmore on Evidence, 3rd Ed. Vol. 4 (1940) § 1230, pp. 434, 437. This rule has been followed in People v. Gerold, 1914, 265 Ill. 448, 460, 107 N.E. 165; People ex rel. Blair v. Ervin, 1940, 375 Ill. 435, 437, 31 N.E.2d 789; Empire Fluorspar Co. v. Knight, 1946, 327 Ill. App. 626, 637, 65 N.E.2d 37; New Amsterdam Cas. Co. v. W. D. Felder & Co., 5 Cir., 1954, 214 F.2d 825, 829; Pallma v. Fox, 2 Cir., 1950, 182 F.2d 895, 902.

We have studied the cases cited by the Bank as holding otherwise but find them distinguished by their facts. For instance, LeRoy State Bank v. J. Keenan's Bank, 1929, 337 Ill. 173, 169 N.E. 1, involved suit for money judgment on a guaranty. An expert witness had examined only part of the books. The purported books were offered in evidence but were rejected as inadmissible because there was no evidence as to their authenticity or accuracy. Hagan Coal Mines, Inc. v. New State Coal Co., 8 Cir., 1928, 30 F.2d 92, concerned a money judgment allowed on a counterclaim in a suit for breach of contract. Precise figures were introduced to prove a net loss of profits. There was no objection to the evidence, which consisted of summaries, as such, which had been made by an expert accountant from books and documents furnished to him by the defendant. However, no foundation was laid to show the character, authenticity, etc. of the books and documents from which the expert accountant worked. People ex rel. Brady v. LaSalle Street Trust & Savings Bank, 1955, 5 Ill.App.2d 261, 286, 125 N.E.2d 654, involved winding up a state bank's

affairs. There was no evidence that the books and records, on which a summary was based, were authentic, etc. Improper use of specific funds was alleged to support a constructive trust on certain assets. The summary was a report made in 1915 to the then attorney for an alleged agent of the receiver of the bank. The drafter of the report was allowed to testify from it, subject to showing that the then receiver and the respondent in this case were one and the same, in which case the drafter of the report would have been the agent of the respondent and the report would have constituted an admission. No such connection was ever shown, and the Master in this case considered the report to be hearsay. In Cabel v. United States, 1 Cir., 1940, 113 F.2d 998, all the records on which an expert witness testified had been neither produced in court, nor made available for inspection. It thus appears that there was sufficient evidence to support the finding that Shelley was insolvent at the time of the assignment.

On the issue of notice of insolvency, our attention has been invited to the case of Irving Trust Co. v. Continental Bank, D.C.D.N.Y.1935, 13 F.Supp. 235. That case concerned a bankrupt and an affiliated corporation which were operated as one business. A store belonging to the affiliate was destroyed by fire. $2,100 of the proceeds of a fire insurance policy were deposited in the bankrupt's account with the Continental Bank. The Continental Bank held notes for loans made to the bankrupt. These were charged to the bankrupt's account and marked "Paid," leaving the bankrupt's account at $2.91. The Court found that the Continental Bank had full knowledge of the fire in the affiliate's store and of its damaging effect on the bankrupt. The transfer of funds was held to be a preference.

In the case before us, the history of overdrafts and unpaid notes, in addition to the type of financial statements submitted to the Bank, and the nature of the financing of Shelley were sufficient to call for inquiry by the Bank, which would have disclosed insolvency. Although many (not all) of the overdrafts were converted to balances on the same day, the Bank's own statements show a clear line of repeated failure to maintain a favorable balance. Mr. Segal testified that the Bank made frequent calls on him to cover overdrafts. Shelley was not meeting the Bank's notes at maturity. Mr. Segal also testified that he did not have the money to pay these notes, and that when the Bank asked about payment, he had said he did not know when he could pay them. The small capitalization of $10,000 was known to the Bank, which had obtained a subordination agreement from the Segals with respect to the Segals' own loans to Shelley. Shortly after the fire, the Bank secured the assignment in question of a $50,000 claim to cover the debt of $19,000 to the Bank.

There were some conflicts in testimony as to when the Bank's almost daily demands for payment began, but the evidence is susceptible of the reasonable inference that these began prior to the assignment.

■■ In determining what facts constitute notice of insolvency each case must be considered on its own facts. The facts of this case clearly distinguish it from other cases cited by the Bank. In Grant v. First National Bank, 1878, 97 U.S. 80, 24 L.Ed. 971, for instance, the bank extended credit to the bankrupt, whose indebtednesses were largely in another county (in a day when communication was slower than it is now) after the alleged preferential payment. The U. S. Supreme Court affirmed the lower court's finding that notice of insolvency was absent. In Stucky v. Masonic Savings Bank, 1883, 108 U.S. 74, 2 S.Ct. 219, 27 L.Ed. 640, the U. S. Supreme Court, in affirming the Circuit Court, stated that the testimony of the bank's agent negatived the idea that he had reasonable ground to believe the debtor insolvent, and that the evidence (which the Court does not describe) did not show insolvency to be known either to the debtor or the bank's agent. The case cited by the Bank, is, therefore, of little assistance to us here. In Salter v. Guaranty Trust

Co. of Waltham, D.C.D.Mass.1956, 140 F.Supp. 111, the alleged preferences were payments before maturity of notes which were all on renewals of loans which originally had been due much earlier. The debtor had promised to pay as he collected for work in progress, and the Court thought advance payment in these circumstances should not have given rise to suspicion of insolvency. There was no evidence of repeated demands for payment as here. The Court found no evidence that the bank's agent knew anything of the debtor's indebtednesses to others.

The finding that Shelley was insolvent and that the Bank was chargeable with notice of Shelley's insolvency is supported by the evidence. The order of the District Court is affirmed.