**BRETT v. J. M. CARRAS, Inc. et al.**
**THE ALEXANDRA.**

No. 10844.

United States Court of Appeals
Third Circuit.

Argued Jan. 20, 1953.

Decided April 14, 1953.

Thomas F. Mount, Philadelphia, Pa., (Rawle & Henderson, Philadelphia, Pa., Joseph W. Henderson, Philadelphia, Pa., on the brief), for appellants.

Paul M. Goldstein, Philadelphia, Pa., for appellee.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

This is a seaman's suit in admiralty for damages, wages, and maintenance and cure.

Libellant, Edmund Brett, was a member of the crew of respondent's tanker Alexandra. On April 6, 1949, the vessel was steaming in the Bay of Biscay and encountering very heavy seas and rough weather. Libellant was ordered to the forecastle head to stow mooring lines which had been left on deck after leaving LeHavre. While on his knees to let go the lashings, he was smashed to the deck and bumped about by a huge wave which broke over the bow. He suffered serious injuries to his head, back, and limbs. He was put in his bunk until the vessel reached Port Said, where he was hospitalized ashore while the vessel went on to the Persian Gulf. Upon her return twenty days later, he went back aboard and was taken to LeHavre and was discharged and on May 19, 1949, was repatriated. For a time he was cared for by his family physician. From July 1 to 11, 1949, he received outpatient treatment at the United States Public Health Service clinic in Philadelphia. He again went under the care of his family doctor until October 11, 1949, when he returned to sea and served until December 8, 1949. From January 6 to 23, 1950, he received physiotherapy treatments for back pains. He reshipped

from February 8 to 11, 1950, and from June 30 to September 5, 1950. X-rays of his skull, taken on September 8, 1950, disclosed that he was suffering from Paget's disease. Again he went to sea and served intermittently from November 15, 1950, to March 26, 1951. During these voyages, his shipmates helped him to a very great extent with his daily tasks, since he was unable to do any but the lightest chores. He has done no work since March of 1951 and has been examined but not treated since January 23, 1950. He suffers from pain in his head and back. The Paget's disease of his skull is gradually increasing in the area involved. In the summer of 1951, he noticed that the pain was moving down to his forehead. The disease has affected his equilibrium so that he has a tendency to pitch forward and must take a step to right himself.

The district court's Finding of Fact No. 17 reads as follows:

"As a result of the accident hereinbefore described libellant sustained injuries to the head, body, back and limbs. He sustained fractures of the 7th and 8th ribs, right side, and fractures of the transverse processes, 2nd and 3rd, left side, and of the 3rd, right side; the healing of the 7th and 8th ribs resulted in excess callus formation, resulting in persistent neuritis. Libellant also sustained a traumatic sprain of the lumbosacral and sacroiliac joints, lumbar region, with aggravation of pre-existing arthritis; and instability of the lumbosacral and sacroiliac joints. In addition, he sustained a ruptured intervertebral disc, lumbosacral region. Finally, as a result of the accident a condition of Paget's disease in libellant's skull was either initiated or activated."

There are also findings that, as a result of his chest and back injuries, libellant is permanently disabled from going to sea or engaging in laborious work but that, as a result of Paget's disease, he is not presently substantially disabled. Finally, on the cause of action for negligence, libellant was awarded $44,440.88, made up of three elements: wages lost, $7,440.88; loss of earning power, $20,000; and pain and suffering, $17,000.

Respondents now admit their negligence, that libellant's chest and back injuries were proximately caused thereby, and that he has suffered from Paget's disease since at least September 8, 1950. The only objection they raise on this phase of the case is that there was no causal connection shown between libellant's head injuries and the onset of Paget's disease, and, therefore, that the awards for loss of earning power and pain and suffering should be substantially reduced. The award for loss of earning power, however, was based solely on the chest and back injuries, not on the existence of Paget's disease. Consequently, even should respondents prevail on their argument concerning Paget's disease, the award for loss of earning power could not be disturbed. The award for pain and suffering is thus the only one open to dispute. A solution of that dispute requires some medical lore.

There was substantial agreement as to the definition of Paget's disease.[1] That given by Dr. Myers, libellant's witness, is fairly typical:

"It is a pathological process of bone due to a vascular change in the bone; there is some change of the blood vessels which supply the bone causing bone inflammation; the bone goes through various stages, and many of these stages are overlapping so that any of the three stages may be present at the same time. The first stage is considered to be rarefaction of the bone, the bone becomes osteoporotic, meaning that the lime salt is being dissolved in the bone, and at the same time there is a certain effort at healing which takes place, so that the bone becomes filled with a sort of fibrous plug and the bone thickens, new bone is laid

1. Osteitis deformans: "Paget's disease of bone; rarefying osteitis leading to bowing of the long bones and deforma- tion of the flat bones." The American Illustrated Medical Dictionary (22d ed. 1951).

down, but it is arranged in a mosaic pattern, it is not regular like normal bone, and the bone thickens completely. Areas of the bone are, therefore, soft and rehardening, and finally the bone becomes very thick and the marrow capacity is more or less obliterated, and the bone becomes very brittle and fractures easily."

Some further facts relating to the disease were brought out. It is always painful. The pain leads the diagnostician to take an X-ray, which is the only way to discover its existence. The X-ray will not, however, determine how long it has been present. If only one bone is affected, it is called monostotic Paget's; if more than one, polystotic. Since only his skull is affected, Brett's is a case of monostotic Paget's disease. As the bones thicken, they press on nerves, and, thus, Paget's of the skull can cause deafness and blindness, and can affect the victim's balance, as it has done in this case. If it progresses into the face bones, the thickening may produce grotesque features, leontiasis ossea, or a lion-like facial expression. There is no known cure for the disease, but it appears that magnesium treatments may have an arresting effect. The experts for both sides were in pretty general agreement as to the above facts. On the causation question, however, they were in sharp conflict.

Libellant's witnesses quite candidly admitted that the cause of the disease is not definitely known today. Leaving aside the radiologist, however, who was called chiefly to interpret the X-ray exhibits, each of libellant's doctors did venture his professional opinion that, in substance, Brett's accident was the cause of his present affliction in that it either initiated Paget's disease in his skull or activated what was a latent Paget's or a bone predisposed to the disease. They reconciled this opinion with their admission that the cause of the disease is not yet known with certainty by explaining that the opinion was based on a theory which holds that trauma does cause mon-

ostotic Paget's, which is what Brett has. They stated that this theory finds support in the medical literature and is entirely consistent with the facts of this case. They conceded their inability to explain the various, intermediate pathological changes which may have occurred between the head injury and the disease but were convinced that the trauma was responsible for Brett's present condition. Perhaps their position was best put by Dr. Myers when he said that his opinion "is as scientific as you can get today about Paget's disease." That is enough, unless there is a rule that there can be no recovery, based on negligence, for a disease the cause of which is not yet known with absolute certainty to medical science. Respondents have shown us no such pronouncement, nor have we found any.

Of course, respondents' doctors vehemently denied that trauma was the cause of libellant's Paget's disease, stating that no one knows what causes it. The district court resolved the conflict in libellant's favor. Respondents thus run head on into the full vigor of the familiar rubric about our reluctance to upset the district court's findings of fact in admiralty where those findings are based upon conflicting oral testimony and where, as here, the district court had full opportunity to observe the witnesses and to appraise their demeanor. We will not disturb such findings unless they are clearly wrong.[2] On the contrary, we think they are amply supported here.

In speaking of expert medical testimony in Armit v. Loveland, 3 Cir., 1940, 115 F.2d 308, 312, we said, "The law does not require that such testimony amount to dogma or that it foreclose the exercise by the jury of its function to determine the ultimate fact." Professor Wigmore, in dealing with a similar issue, states, "If physicians are willing to estimate certain consequences as probable or possible, it is hardly proper for judges to affirm the untrustworthiness of these conclusions."[3] This

**2.** The Mamei, 3 Cir., 1945, 152 F.2d 924, certiorari denied, 1946, 328 U.S. 836, 66 S.Ct. 981, 90 L.Ed. 1611; The S.C.L. No. 9, 3 Cir., 1940, 114 F.2d 964; Benedict, Admiralty, § 573 (6th ed. 1940).

**3.** Wigmore, Evidence, § 663 (3d ed. 1940).

should apply as well to causes as to consequences. Furthermore, "The burden of the scientific limitations of our society should not be cast on injured plaintiffs in circumstances such as existed in the instant case." Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 1951, 190 F.2d 825, 828. Here, libellant's doctors, while admitting the present limited state of medical knowledge, were convinced that the accident brought on libellant's Paget's disease. It is not for us to say they are wrong or to hold that their denial of omniscience wholly destroys their testimony.

On the cause of action for maintenance and cure, libellant was awarded maintenance for 657 days, or all the days between his arrival in this country following his discharge and the last day of trial, excepting days worked on other vessels.[4] As we understand respondents' contention on this part of the case, it is that he is entitled to maintenance for only 162 days because he may receive maintenance only for those days during which he actually received cure, and his last treatment was on January 23, 1950.

There is a basic misconception running through respondents' argument. They ignore the fact that libellant sustained several serious injuries, aside from Paget's disease, and that these injuries cause him pain and prevent his returning to sea or engaging in any but sedentary work. His case for maintenance, therefore, does not stand or fall on Paget's disease alone.

 The shipowner's duty to provide maintenance and cure does not end with the voyage. It continues for a fair period after that time, during which improvement in the seaman's condition could reasonably be expected to result from nursing, care, and medical treatment.[5] The district court concluded that such period, in this case, covered the time from libellant's arrival in this country until the last day of trial. This conclusion is well supported. There was medical testimony that libellant's back could be strengthened and his pain relieved by an operation at the site of his ruptured intervertebral disc. His back condition would be improved if he were furnished with a brace.[6] These were the very factors upon which we bottomed an award for maintenance in Lipscomb v. Groves, 3 Cir., 1951, 187 F.2d 40. We see no reason to depart from that case now. It, therefore, becomes unnecessary to consider whether magnesium treatments, which might arrest the development of Paget's disease, would be curative treatments within Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, and Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

The decree of the district court will be affirmed.

---

4. This was without prejudice to future suits for maintenance and cure to which he may then be entitled.

5. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

6. After January 23, 1950, libellant was unable to obtain relief at the United States Public Health Service.