Otto E. PRITCHARD, Appellant,

v.

LIGGETT & MYERS TOBACCO COMPANY.

No. 13267.

United States Court of Appeals Third Circuit.

Argued May 5, 1961.

Decided Oct. 12, 1961.

Rehearing Denied Nov. 7, 1961.

James P. McArdle, Pittsburgh, Pa. (James E. McLaughlin, McArdle, Harrington & McLaughlin, Pittsburgh, Pa., Charles Alan Wright, Austin, Tex., on the brief), for appellant.

Bethuel M. Webster, New York City (Frederick P. Haas, Donald J. Cohn, Webster, Sheffield, Fleischmann, Hitchcock & Chrystie, New York City, Earl F. Reed, Kenneth G. Jackson, Thorp, Reed & Armstrong, Pittsburgh, Pa., on the brief), for appellee.

Before GOODRICH, STALEY and FORMAN, Circuit Judges.

STALEY, Circuit Judge.

Otto E. Pritchard, plaintiff, commenced this action, alleging that cancer of his right lung was caused by smoking Chesterfield cigarettes between 1921 and the time it was removed in 1953.[1] Basing his case on negligence and breach of warranty, plaintiff sought compensatory and punitive damages.

To support the negligence claim, plaintiff alleged that Chesterfield cigarettes, manufactured by defendant Liggett & Myers Tobacco Company, contained unwholesome, deleterious and harmful carcinogenic ingredients, making them unsafe for human consumption. Plaintiff also alleged that defendant represented that smoking Chesterfields was not harmful.[2]

The district court first required proof of the causal relationship between smoking and lung cancer, which plaintiff attempted to establish through the testimony of five medical experts. First there was Dr. William F. Kremer, who diagnosed plaintiff's condition and at the time of trial was medical director of the Denver Chemical Corporation. Previous to that, Dr. Kremer had served a residency in internal medicine and had had extensive experience in therapeutics and diagnosis. He was certified by the American Board of Internal Medicine and had served as a member of the faculty of the University of Pittsburgh Medical School. He was followed by Dr. Victor H. Kaunitz, an extensively trained and experienced thoracic surgeon from Buffalo, New York. The record shows that he did postgraduate work in thoracic surgery at several hospitals and at the time of his testimony was attending thoracic surgeon at five hospitals in New York state. Dr. Richard H. Overholt, of Boston, Massachusetts, testified that after medical school he did postgraduate work in surgery at the University Hospital in Philadelphia and served as instructor in surgery at the University of Pennsylvania. He established and, at the time of his testimony, was a member of the Overholt Thoracic Clinic in Boston. Dr. Charles S. Cameron testified that after receiving his medical education, he served as a Rockefeller Fellow at the Memorial Hospital in New York, a large cancer clinic. For a time he served as

1. The cancer involved here is medically known as bronchogenic carcinoma, squamous cell type.

2. Jurisdiction is based on diversity of citizenship, plaintiff being a citizen of Pennsylvania and defendant a New Jersey corporation. The parties agree that Pennsylvania substantive law applies.

medical and scientific director of the American Cancer Society. At the time of his testimony, Dr. Cameron was Dean of Hahnemann Medical College in Philadelphia where a research project dealing with the relationship between tobacco and cancer was in progress. He also served with several national organizations and an international one dealing with cancer control. His writings were extensive and included publications dealing with cancer prepared for governmental agencies. Dr. Morton L. Levin of Buffalo, New York, was the plaintiff's last medical expert. He also was a well qualified witness. In 1936 he came to the Cancer Hospital of the State of New York to specialize in the study of the epidemiology of cancer. He was associated with a special commission created by the New York State Legislature in 1937 to study cancer and served as director of the Bureau of Cancer Control of the New York State Department of Health. At the time of his testimony, Dr. Levin was professor and head of the Department of Epidemiology at the Roswell Park Memorial Institute and a member of the National Research Council's special committee created to study the carcinogenic effect of food additives, and was associated with the World Health Organization of the United Nations.

The defendant made a series of motions. First, it moved to dismiss the warranty count which was denied, only to be followed by another motion made at the close of plaintiff's evidence on causation and another made at the close of plaintiff's case based on the contention that plaintiff failed to establish negligence. The court granted the motion as to the breach of warranty claim but denied it as to the negligence count. After both parties had introduced all of their evidence and rested, the district court granted defendant's motion for a directed verdict, saying:

"* * * The Court is of the opinion that no substantial evidence has been offered to support a verdict against the defendant on any theory of negligence, and that fair minded men could not differ as to the conclusions of fact to be drawn from the evidence.

"The motion is granted, and the Jury is directed to find a verdict in favor of the defendant Liggett and Myers Tobacco Company, and against the plaintiff Otto E. Pritchard."

Plaintiff's basic complaint is that he was denied the right, allegedly guaranteed to him by the Seventh Amendment to the Constitution, to have his case submitted to the jury. He refines his position by contending that even though this is a diversity case, for the purpose of determining whether his case should be submitted to the jury, the standards applicable to actions under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, et seq., and the Jones Act, 46 U.S.C.A. § 688, et seq., must be used in a federal court. See Dill v. Scuka, 3 Cir., 1960, 279 F.2d 145; 5 Moore's Federal Practice ¶ 38.09 et seq. (1951). Further, he contends that even if the standards adopted by the Pennsylvania courts apply, he is entitled to have his case submitted to a jury under his evidence. The defendant answers that Pennsylvania law governs both as to what the plaintiff had to prove and the sufficiency of the evidence to go to the jury, and that under that standard the district court properly directed a verdict.

That question, however, need not be decided here, for we think that even under the rule followed in Pennsylvania the plaintiff's evidence in the record before us definitely presents a jury question. Larkin v. May Department Stores Co., 3 Cir., 1958, 250 F.2d 948. In Pennsylvania, a directed verdict can be entered only where the facts are such that reasonable men could not draw different conclusions from them. In passing on the motion, a court must view the evidence in the light most favorable to the party opposing it, giving him the benefit of every favorable inference. Hardiman v. Pittsburgh Railways Co., 1940, 339 Pa. 79, 14 A.2d 72; Hayes v. Axelrod, 1939,

332 Pa. 518, 3 A.2d 346; 6 Standard Pennsylvania Practice 98 (1960).

It will be remembered that at trial the court required proof of causation before proceeding to other issues, and at this point the district court denied a motion by defendant to dismiss. In ultimately granting the motion under F.R.Civ.P. Rule 50, 28 U.S.C.A., the district court did not make it clear whether the proof of causation was insufficient or whether his decision was based solely on plaintiff's failure to prove negligence. That being so, we deem it advisable to meet the question of the sufficiency of the evidence of causation first. We have outlined above the background of plaintiff's witnesses who testified as to causation. Each of the doctors testified that in his opinion plaintiff's cancer was caused by long continued smoking.

Defendant, however, contends that even though the plaintiff's experts may have given categorical opinions concerning the relationship between smoking and cancer, such opinions should have no validity since there was no proof of the acceptance of this relationship by the medical profession. Aside from the fact that the testimony in question reveals that such acceptance existed, this contention has no merit unless we are to overrule what we said in Brett v. J. M. Carras, Inc., 3 Cir., 1953, 203 F.2d 451, which was approved by us in Deitz v. United States, 3 Cir., 1955, 228 F.2d 494. See also Puhl v. Milwaukee Automobile Ins. Co., 1959, 8 Wis.2d 343, 99 N.W.2d 163; People of the State of New York v. Williams, 1959, 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549; McKay v. Texas, 1950, 155 Tex.Cr.R. 416, 235 S.W.2d 173; 2 Wigmore, Evidence §§ 662, 663 (1940, 3d ed.). This we have no intention of doing. At best, defendant's contention is one for the jury since it goes to the weight to be given the several expert opinions.

The defendant's motion to dismiss the warranty count, which was granted, was based on the ground that plaintiff's notice of breach was neither timely nor sufficient as a matter of law.[3] In addition, the defendant contends that no breach occurred since plaintiff failed to prove causation, that no express warranty existed, and that in the absence of proof that Chesterfield cigarettes did not meet the standard of cigarettes generally sold, there is no evidence to support a breach of an implied warranty of merchantability.

Under a warranty of fitness for a particular use, the seller warrants that the goods sold are suitable for the special purpose of the buyer, while a warranty of merchantability is that the goods are reasonably fit for the general purposes for which they are sold. Frantz Equipment Co. v. Leo Butler Co., 1952, 370 Pa. 459, 88 A.2d 702. Here, the facts support both a warranty of merchantability and fitness for use, i. e., that Chesterfield cigarettes were reasonably fit and generally intended for smoking without causing physical injury. The evidence compellingly points to an express warranty, for the defendant, by means of various advertising media, not only repeatedly assured plaintiff that smoking Chesterfields was absolutely harmless, but in addition the jury could very well have concluded that there were express assurances of no harmful effect on the lungs. As far back as July 16, 1934, an advertisement appeared in a Pittsburgh newspaper claiming that as to Chesterfields:[4]

> "A good cigarette can cause no ills and cure no ailments * * * but it gives you a lot of pleasure, peace of mind and comfort."

Later that month, it was said:[5]

> "There is no purer cigarette made than Chesterfield."

Assurances also appeared in national magazines. After showing a picture of

---

3. The breach of warranty claim is based on the Uniform Sales Act, 69 Purdon's Pa.Stat.Ann. §§ 121, 124.

4. The Pittsburgh Press, July 16, 1934.

5. The Pittsburgh Press, July 26, 1934.

Liggett & Myers Research Laboratories, this statement follows: [6]

"The constant quality tests and advanced research in Chesterfield's modern laboratories are your guarantee that Chesterfields will always be much milder—the best cigarette for you to smoke."

On several occasions in 1953, advertisements similar to the following appeared: [7] "Chesterfield is Best for You." Before that, it was said that Chesterfields are[8] "Good—they've got to be good."

One systematic and nationwide advertising campaign stands out in the record. In essence, it said that "Nose, throat, and *accessory organs* not adversely affected by smoking Chesterfields." (Emphasis supplied.) It appeared in a Pittsburgh newspaper, [9] a national magazine,[10] and was repeated on a national television program featuring Arthur Godfrey. Typical of the commercials he presented was the following:[11]

"* * * You hear stuff all the time about 'cigarettes are harmful to you' this and that and the other thing. * * *

"Here's an ad, you've seen it in the papers—please read it when you get it. If you smoke it will make you feel better, really.

"Nose, throat and accessory organs not adversely affected by smoking Chesterfield. This is the first such report ever published about any cigarette. A responsible consulting organization has reported the results of a continuing study by a competent medical specialist and

his staff on the effects of smoking Chesterfield cigarettes."

Later, Godfrey said: [12]

"That they mean what they say— that specialist said it, Liggett and Myers have substantiated it. Remember that when you're wondering about cigarettes. Smoke Chesterfields—they're good. Thank you."

We think that the clear import of this advertising campaign was to lead smokers to believe that in order to "Play Safe—Smoke Chesterfield." [13] Plaintiff testified that he relied on these assurances thinking that he would suffer no adverse effects from smoking Chesterfields. Whether it was reasonable for him to so rely was, of course, a matter for the jury.

■ From the evidence, the jury could very well have concluded that there was a breach of an implied warranty of merchantability. If supported by the record, the district court could charge the jury that they are to consider the practices of other cigarette manufacturers and the quality of cigarettes they manufacture as bearing on the question of merchantability. Such practices, however, are not conclusive, for "what usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pacific Ry. Co. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905. Of course, they would be considered side by side with defendant's assurances.[14]

---

6. Time, February 20, 1950.

7. Life, February 23, March 23, April 20, June 1, August 3, and August 10, 1953.

8. Saturday Evening Post, December 19, 1931.

9. The Pittsburgh Press, September 22, 1952.

10. Life, January 26, 1953.

11. Program of September 24, 1952. Similar statements were made on September 17, 1952.

12. Program of November 5, 1952.

13. Life, August 11, 1952.

14. To support its proposition that no implied warranty of merchantability existed since plaintiff failed to show that Chesterfield cigarettes did not meet the standards of cigarettes sold *generally*, defendant refers us to and quotes from Frantz Equipment Co. v. Leo Butler Co., 1952, 370 Pa. 459, 464–465, 88 A.2d 702, 706. The court there, however, was referring to those cases where items are sold by brand name. It has never been

Section 49 of the Uniform Sales Act, 69 Purdon's Pa.Stat.Ann. § 259, contains the notice requirement and provides:

" \* \* \* But if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty, within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor."

Plaintiff's notice, which was received by defendant's agent on October 21, 1954, read:

"This is to inform you that our client, Otto E. Pritchard, has elected to treat an injury he received as a result of smoking Chesterfield Cigarettes as a breach of warranty on the part of Liggett & Myers Tobacco Co."

■ Where more than one inference may be drawn from undisputed facts, or the facts are disputed, the timeliness and sufficiency of a notice of breach of warranty are questions for the jury to resolve.[15] The question of reasonableness must be determined from the circumstances in the individual case. Columbia Axle Co. v. American Automobile Ins. Co., 6 Cir., 1933, 63 F.2d 206, 208.

■ There is authority to support the proposition that the peculiar circumstances surrounding the buyer after he knew or should have known of the breach may be considered. That was true in Pennsylvania even before passage of the Uniform Sales Act. Hanna v. Fearl, 1889, 129 Pa. 588, 18 A. 556. In sending the question of reasonableness to the jury, the court, while construing Pennsylvania law in Bonker v. Ingersoll Products Corp., 132 F.Supp. 5, 6 (D.Mass. 1955), said:

"The cases indicate that it is appropriate to take into consideration the plaintiff's situation. Undoubtedly the plaintiff would have been able to write a letter to the defendant long before August 1. She did know, however, that her mother had immediately notified the grocery store. While I assume she could have seen a lawyer before August 1, still was it so unreasonable for her to wait a day short of four months, which was only two weeks after her fourth and last operation, to the extent that I must now say that as a matter of law she cannot recover?"[16]

One of the factors to be considered is, did the delay in giving notice or its form prejudice the seller? The Pennsylvania cases have approached the prejudice question by engrafting the doctrine of laches onto § 49 of the Uniform Sales Act, Kull v. General Motors Co., 1933, 311 Pa. 580, 166 A. 562; Bromley v. Morse, 1925, 284 Pa. 588, 131 A. 479. "Laches," the

---

alleged here that the Chesterfields purchased and smoked by plaintiff were not of the same quality as those generally sold.

15. Victorson v. Albert M. Green Hosiery Mills, 3 Cir., 1953, 202 F.2d 717, 41 A.L.R.2d 806; Texas Motorcoaches, Inc. v. A. C. F. Motors Co., 3 Cir., 1946, 154 F.2d 91; United States Gypsum Co. v. Birdsboro Steel Foundry & Machine Co., 1947, 160 Pa.Super. 548, 52 A.2d 344; 32 Pa.L.Encyc. § 296 (1960). As to timeliness, it has been said that "the question of what is a reasonable time, under the Commercial Code as under the Sales Act, will be a question of fact for the jury unless but one inference can be drawn therefrom as to reasonableness." Sell, Sales, 1956–1957 Survey of Pa.Law, 19 U. of Pitt.L.Rev. 306 (1958). See

Magnavox Co. v. Royson Engineering Co., 1961, 195 Pa.Super. 139, 169 A.2d 559.

16. Cited and discussed in Burket v. Westmoreland Supply Co., 41 Westmoreland L.J. 35 (Pa.Com.Pl.1958). The Uniform Commercial Code, 12A Purdon's Pa.Stat. Ann. § 2–607(3), carries forward the requirements on notice of breach under § 49 of the Uniform Sales Act. Draftsmen's comments to that subsection read as follows: "The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, *for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.*" (Emphasis supplied.)

Pennsylvania Supreme Court said in In re Grote's Estate, 1957, 390 Pa. 261, 269, 135 A.2d 383, 387, "arises when a defendant's position or rights are so prejudiced by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be an injustice to permit presently the assertion of a claim against him."

■ Here, the plaintiff lost a substantial amount of weight after his lung was removed on December 11, 1953. The record shows that during convalescence he weighed one hundred and forty pounds from a pre-operation weight near one hundred and ninety pounds. Ten days after being discharged from the hospital, he was readmitted because of recurring vomiting and inability to swallow. He remained there until January 6, 1954. Thereafter, he periodically visited another hospital in Pittsburgh where his esophagus was dilated. He also suffered hemorrhages and experienced shortness of breath. In June of 1954, he was given physiotherapy treatments for his right leg, and saw Dr. Kent as a follow-up patient during the year following surgery. His physical condition apparently was such that he did not return to work until 1955. Plaintiff was a layman inexperienced in the scientific complications involved here that took many weeks of preparation and trial to unravel. There is no allegation or intimation that defendant has suffered any prejudice by not receiving notice sooner or in a different and more comprehensive form. The lack of prejudice is best manifested by the vigorous and thorough defense presented. Although notice was not given for approximately ten months, it cannot be said that under these circumstances it was untimely and insufficient as a matter of law.

To support his contention that the form of notice was inadequate, defendant cites and relies on two decisions which deserve brief comment. In Texas Motorcoaches, Inc. v. A. C. F. Motors Co., 3 Cir., 1946, 154 F.2d 91, the only evidence of notice was that two inspectors apparently employed by the manufacturer or distributor of the defective materials used in a bus were present when it was inspected and one of them was instrumental in obtaining new parts for the entire fleet. In Aaron Bodek & Son v. Avrach, 1929, 297 Pa. 225, 227, 146 A. 546, 547, 548, "the only thing plaintiffs did was to ask defendants to go and look at the blankets. There was no assertion that there was anything wrong with them, or if it was it failed to state any particulars." Here, of course, plaintiff clearly informed defendant that he suffered an injury as a result of smoking Chesterfields.

On the negligence claim, plaintiff contends that the evidence conclusively shows that defendant was negligent in failing to warn him that certain substances, allegedly cancer-producing, were present in Chesterfields although it knew or should have known that fact. Defendant contends that there is no evidence in the record to show that at the time plaintiff contracted cancer, defendant had or in the exercise of reasonable care should have had any knowledge or notice that lung cancer probably would have resulted from prolonged excessive smoking.

■ In Pennsylvania, one who supplies a product to another and knows or should know that the foreseeable use is dangerous to human life unless certain precautions are taken, and who realizes or should realize that the user will not in the exercise of reasonable vigilance recognize the danger, is under a duty to warn the user of such consequences and to advise proper precautions. Hopkins v. E. I. Du Pont De Nemours, 3 Cir., 1952, 199 F.2d 930; Maize v. Atlantic Refining Co., 1945, 352 Pa. 51, 41 A.2d 850, 160 A.L.R. 449; Restatement, Torts § 388 (1934). The precautions necessary to comply with the standard of reasonableness vary with the danger involved. Maize v. Atlantic Refining Co., supra; MacDougall v. Pennsylvania Power & Light Co., 1933, 311 Pa. 387, 166 A. 589.

On the question of awareness of the danger, the plaintiff offered the testimony of several expert witnesses. Dr.

Kremer testified that knowledge of the connection between smoking and epidermoid cancer was being disseminated many years prior to 1953. Dr. Kaunitz testified that he noted a relationship between heavy smoking and lung cancer as early as 1946, while Dr. Cameron said that literature on the relationship between smoking and lung cancer was available half a century ago. He himself became interested in the relationship in the mid 1930's. Dr. Overholt testified that he became suspicious that a connection existed between heavy smoking and lung cancer in the early 1940's, and that he himself stopped smoking. Dr. Levin started research on the relationship between smoking and lung cancer in 1939 after reading a German article dealing with the subject.

▆▆▆ In addition, there was evidence that in 1952 defendant conducted tests admittedly to determine the effects of smoking Chesterfields on the nose, throat and accessory organs. Apparently, this was the only test undertaken by defendant to determine the harmful effects on human beings from smoking its products. It was conducted by Arthur D. Little, Inc., which was employed by defendant for this purpose. As a result of this test, it was concluded that smoking Chesterfields had no harmful effect on "nose, throat, and accessory organs." There was evidence in the record that these tests were inconclusive and inadequate as the basis for such a conclusion. In addition, the case notes of the doctor who examined persons that participated in the test show that some of them suffered harmful effects from smoking Chesterfields. There was further evidence that the tests were widely publicized and the results used in advertisements to assure the plaintiff and the general public that smoking Chesterfields was harmless. It has been said that one supplying "a chattel is subject to liability if by word

or deed he leads those who are to use the chattel to believe it to be of a character or in a condition safer for use than he knows it to be or to be likely to be." Restatement, Torts, comment b, § 388 (1934).[17] Furthermore, between 1921 and 1953, defendant made no tests to determine the carcinogenic content of Chesterfields, or the relationship between lung cancer and smoking. Under these circumstances, whether it was reasonable for defendant not to have conducted different or additional tests was clearly a matter that should have been submitted to the jury.

The same can be said for defendant's failure to give warning of any cancer-producing ingredients that were in Chesterfields. That is made clear by what was said in Maize v. Atlantic Refining Co., 1945, 352 Pa. 51, 41 A.2d 850.

There remains one last point to be discussed. Plaintiff contends that the district court committed error in excluding from evidence a bibliography containing seven hundred and ninety-five references to articles supposedly dealing with the allegedly harmful effect of tobacco upon the human body. He bottoms his position on the assertion that the titles constitute a summary of the articles and that such a summary is accepted where the original materials are voluminous, and goes on to say that this rule is particularly pertinent here since the bibliography was "not offered to prove the truth or falsity of any matter * * * but solely to prove that there was in existence a vast body of literature about its products of which defendant was unaware." The essence of defendant's position is that there has been no showing that the titles are an accurate summary of the original materials.

▆▆▆ The general rule is that the use of a summary is a matter that rests within the sound discretion of the trial court. Standard Oil Co. of California v.

17. Defendant contends that the phrase "accessory organs" does not include lungs. Whether it was reasonable for the plaintiff, as a layman, to think that lungs were accessory organs to the nose and throat was for the jury to decide. It should be noted that defendant later dropped the phrase from its advertising and substituted the word "sinuses."

Moore, 9 Cir., 1957, 251 F.2d 188, certiorari denied, 1958, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148; Royal Pioneer Paper Box Mfg. Co. v. Louis DeJonge & Co., 1955, 179 Pa.Super. 155, 115 A.2d 837; Keller v. Porta, 1953, 172 Pa.Super. 651, 94 A.2d 140. Certain criteria have evolved to guide a court in exercising its discretion. So, a proper foundation must be laid with reference to the admissibility of the originals. More importantly, it must be shown that the summation accurately summarizes the materials involved by not referring to information not contained in the original. Standard Oil Co. of California v. Moore, supra. Usually the records or materials summarized must first be made accessible to the opposing party for inspection and for use in cross examination. In re Shelley Furniture, Inc., 7 Cir., 1960, 283 F.2d 540; Board of County Commissioners of Wyandotte County Kansas v. William J. Howard, Inc., 10 Cir., 230 F.2d 561, certiorari denied, 1956, 351 U.S. 926, 76 S.Ct. 784, 100 L.Ed. 1456.

▆ Plaintiff did not offer to produce in court or otherwise make available all of the original articles listed in the bibliography. They were not available to defendant for its perusal or for use in cross examination. At best, plaintiff offered "abstracts" or "reprints" of two hundred and fifty-one of the articles. Additionally, no evidence was offered to show that the titles constituted an accurate summary of the original mass. Plaintiff did offer to prove the reliability of the source material from which the title references were gathered and the procedure employed in compiling the bibliography. This offer would be meaningful, however, only if we were to assume that the titles are accurate summations, which common sense forbids us from doing. In light of these facts, we cannot say that the district court abused its discretion.

Plaintiff urges his contention is supported by Braun v. Roux Distributing Co., Mo.1958, 312 S.W.2d 758. We think not, for the objection raised there to the use of a bibliography "was to the hearsay nature of the evidence and to the doctor's expressing his opinion as to the value of the opinions expressed by [the] others which, of course, would be improper," (id. at page 763) and the court never discussed the evidentiary rule we feel is controlling.

The judgment of the district court will be reversed and the cause remanded with directions that plaintiff be granted a new trial.[18]

GOODRICH, Circuit Judge (concurring in result).

While I concur in the result which sends this case back for another trial and submission to the fact finders, it seems desirable to me to express my understanding of the basis on which it is to be returned.

There is language in some of the advertisements for Chesterfield cigarettes shown in the evidence which could be understood to assert a claim on the defendant's part that these cigarettes are harmless. In newspaper and magazine advertisements the public was told that "Nose, throat, and accessory organs [are] not adversely affected by smoking Chesterfields," and that "A good cigarette can cause no ills and cure no ailments." Arthur Godfrey, on a program sponsored by defendant, broadcast that he "never did believe they [Chesterfields] did any harm and now we, we've got the proof." If a manufacturer assures his potential public that his product is harmless and it is proved that it is not harmless, he can be held, no doubt, for breach of warranty. Pa.Stat.Ann. tit. 12A, § 2–313 (Supp.1960); Uniform Commercial Code § 2–313; Uniform Sales Act § 12. And when a person makes to another a statement of fact which he does not know to be true, intending that the other shall act in reliance on the truth of that statement, he

---

18. In light of the concurring opinion, we deem it advisable that at the new trial the court submit the case to the jury on interrogatories so that it will be known on what basis the jury determined liability, if any.

**302**

is liable for negligent misrepresentation. Restatement, Torts § 310 (1934); Robb v. Gylock Corporation, 1956, 384 Pa. 209, 120 A.2d 174.[1] If the defendant here takes the position that nobody knows whether cigarettes cause cancer or not but at the same time asserts to buyers that Chesterfield cigarettes do not cause cancer, it is in difficulty if a customer shows that the use of these cigarettes caused cancer in him.

Further than that I am unwilling to go. Take a sale of potentially dangerous subject matter like whiskey. Everybody knows that the consumption of intoxicating beverages may cause several different types of physical harm. This goes clear back to the era of the Old Testament:

> "Woe unto them that rise up early in the morning, *that* they may follow strong drink * * *." *Isa.* 5:11.

> "Who hath woe? who hath sorrow? who hath contentions? who hath babbling? who hath wounds without cause? who hath redness of eyes?

> "They that tarry long at the wine; * * *." *Prov.* 23:29-30.

If a man buys whiskey and drinks too much of it and gets some liver trouble as a result I do not think the manufacturer is liable unless (1) the manufacturer tells the customer the whiskey will not hurt him or (2) the whiskey is adulterated whiskey—made with methyl alcohol, for instance. The same surely is true of one who churns and sells butter to a customer who should be on a nonfat diet. The same is true, likewise, as to one who roasts and sells salted peanuts to a customer who should be on a no-salt diet. Surely if the butter and the peanuts are pure there is no liability if the cholesterol count rises dangerously.

---

[1]. Especially appropriate in this connection is Illustration 1 to comment *b* of § 310:
"1. A tells B that he has tried the ice on a certain pond and found it thick enough for safe skating knowing that he has not tried it and knowing nothing of

In this case there was no claim that Chesterfields are not made of commercially satisfactory tobacco. See Restatement (Second), Torts § 402A (Tent. Draft No. 6, 1961).

the condition of the ice, which in fact is dangerously thin although not so appearing. B, in reliance on A's statements, attempts to skate upon the pond and falls in, catching a severe cold. A is liable to B."