403 F.2d 766
 SPEYER, INC., and Yellow Cab Company of Erie, Appellants,
v.
HUMBLE OIL AND REFINING COMPANY and A. O. Smith Corporation.
Speyer, Inc., Appellant in No. 17057.
Yellow Cab Company of Erie, Appellant in No. 17058.
 Nos. 17057, 17058.
 United States Court of Appeals Third Circuit.
 Argued Sept. 17, 1968.
Decided Nov. 12, 1968, Rehearing Denied Jan. 7, 1969, As
Amended April 14, 1969.
 
 John G. Gent, Quinn, Plate, Gent, Buseck & Leemhuis, William Knox, Knox, Graham, Pearson & McLaughlin, Erie, Pa., for appellants.
 Cloyd R. Mellott, Eckert, Seamans & Cherin, Pittsburgh, Pa., John M. Wolford, Dunn & Wolford, Erie, Pa., Barton Z. Cowan, Pittsburgh Pa., on the brief, for appellee, Humble Oil & Refining Co.
 Raymond G. Hasley, Rose, Schmidt & Dixon, Pittsburgh, Pa. (Roger Curran, Pittsburgh, Pa., on the brief), for appellee, A. O. Smith Corp.
 Before McLAUGHLIN, KALODNER and ALDISERT, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge:
 
 
 1
 A gasoline fire destroyed plaintiff Speyer's garage and sixty-five taxicabs owned by plaintiff Yellow Cab Company of Erie, a tenant of Speyer. A diversity suit to recover the fire damage was instituted in the District Court against Humble Oil and Refining Company, a gasoline supplier, and A. O. Smith Corporation,successor-in-interest to the manufacturer of a certain gasoline pump. A twelve-day non-jury trial followed, and the court, after receiving 2,000 pages of transcribed testimony, rendered judgment in favor of both defendants.[1] Both plaintiffs have appealed from the trial judge's findings and conclusions.
 
 
 2
 In April, 1954 an Erie Meter Systems Model #910 gasoline pump was installed in the garage by Cemico, then the gasoline supplier of Yellow Cab. The pump was purchased from Erie Meter Systems by Cemico. In October, 1955 Yellow Cab changed its supplier from Cemico to Humble, and purchased Cemico's pump. As an accommodation to its new customer, Humble purchased the pump from Yellow Cab and leased it back on a free basis. Yellow Cab employed no regular gasoline pump attendants; each driver filed his cab's tank at the completion of his shift.
 
 
 3
 As required by the equipment lease, Humble serviced and repaired the equipment from time to time, either through its own employees or through the services of independent contractors. In October, 1963 one of these contractors, Jabe, installed, a new type heavy-duty flexsteel hose on the pump.[2] In April, 1964 two mishaps occurred. On April 20, the bumper of a cab hooked the flexsteel hose, and, as the driver drove his vehicle in the garage, the hose stretched extensively, and a quantity of gasoline leaked from the pumping equipment to the floor. Yellow Cab then shut down the pump. An investigation by the service contractor disclosed that a metal meter casting had fractured within the pump; the entire meter unit, including the metal cover casting was replaced, and the pump returned to service.
 
 
 4
 Nine days later, on April 29, a similar incident occurred. One of the drivers failed to remove the hose from his cab's tank before driving away from the pump. This caused the hose to jerk and stretch violently, bending the metal pipe coupling to which it was attached at the pump. Although most of the Yellow Cab employees witnessing this misadventure were aware of the leakage which had followed the accident nine days before, no one inspected the pump. Instead, another driver who had observed the violent jerking of the hose proceeded to place the pump in operation to fill his own tank. Shortly thereafter, gasoline was discovered on the floor near the pump. This time the spilled gasoline erupted into flames, and the entire building and a large number of cabs were destroyed.
 
 
 5
 All parties agreed that the leakage of gasoline had been caused by the inability of the pump mechanism to relieve excess pressure which had been created within the system. The basic factual dispute was on the issue of what caused a dysfunction of certain pressure-relief valves.
 
 
 6
 The pre-trial statement of the plaintiffs and their evidence presented at trial disclose that they proceeded on various theories of liability. As to Humble: (1) defendant should be held to 'the strict liability doctrine as applied to suppliers as well as manufacturers of equipment';[3] (2) defendant breached the high degree of care to which it should be held because the equipment dispensed 'a highly volatile and dangerous substance';[4] (3) defendant failed to inspect and maintain the equipment properly, 'and as a result thereof, the relief valve system malfunctioned' due to '* * * either a clogging with excessive grit or dirt, or to improper adjustment by Humble Oil Company or its agents'; (4) defendant provided a pump containing a casting which was 'not adequate or proper'.
 
 
 7
 As to A. O. Smith: (1) defendant improperly designed the meter head, furnishing a casting of 'relatively poor grade material and the thickness of the casting was less than required under good engineering principles and practices'; (2) defendant failed to provide 'fail safe' devices to furnish a warning relating to the buildup of pressures.[5]
 
 
 8
 The defendants contended that the proximate cause of the fire was the negligence of the Yellow Cab driver in failing to remove the nozzle from the tank prior to the cab's pulling away from the pump. They produced testimony that the pulling of the hose caused the steel components of the hose to contract, creating a buildup of pressure which led to the fracture of the casting.[6]
 
 
 9
 The court agreed with the defendants. It concluded that the fire was caused by the negligence of the plaintiff Yellow Cab, specifically indicating that the fire resulted from:
 
 
 10
 '* * * the failure of the driver whose duty it was to remove the nozzle from the filler pipe before driving away from the pump, so to do. Nor is it a defense to argue as plaintiff does, that he could not have been aware of the exact nature of the danger involved; it is sufficient that he be, or should be, reasonably aware that the natural consequences of his act be dangerous.'
 
 
 11
 The court said it had no difficulty in finding that the failure to remove the nozzle from the tank was negligence and that 'such negligence was the proximate cause of the fire'.
 
 
 12
 Rule 52 of the Federal Rules of Civil Procedure provides that 'findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses'. The Court defined the meaning of 'clearly erroneous' in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1949): 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i.e., whether we are 'left with a definite and firm conviction that a mistake has been committed'. Eastern Express, Inc. v. Mack Warehouse Corp., 326 F.2d 554 (3 Cir. 1964); International Industries, Inc. v. Warren Petroleum Corp.,248 F.2d 696 (3 Cir. 1959), cert. denied, 355 U.S. 943, 78 S.Ct. 529, 2 L.Ed.2d 523 (1959); Williams v. Babcock & Wilcox Co., 262 F.2d 253 (3 Cir. 1959), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836 (1959).
 
 
 13
 The basic evidence on liability was introduced by expert witnesses. The matter of weighing the credibility and persuasiveness of expert opinion is the unique function of the trier of fact. We stated in Brett v. J. M. Carras, Inc., 203 F.2d 451 (3 Cir. 1953), that the findings of the trial judge will not be disturbed 'where those findings are based on conflicting oral testimony and where, as here, the district court had full opportunity to observe the witnesses and to appraise their demeanor.' 203 F.2d at 453. More recently, in Hadco Products, Inc. v. Frank Dini Co., 401 F.2d 462 (1968), we ruled that a choice between two permissible views by the fact finder is not 'clearly erroneous' within the meaning of Rule 52.
 
 
 14
 The District Court accepted the testimony of the defense witnesses and rejected that of the plaintiffs. We cannot conclude that it was clearly erroneous to do so.
 
 
 15
 Plaintiffs now assert an alternative argument: that defendants were negligent in installing the flexsteel hose because it was foreseeable that certain uses of this hose would cause an extraordinary internal pressure which would fracture the meter casting. They argue that both defendants were chargeable with such knowledge, and hence were negligent in not rectifying the condition or issuing a warning about it. The argument is ingenious when viewed in the context of the history of this case. This theory was not advanced by plaintiffs in their pre-trial statements nor in their case-in-chief; moreover, the thrust of their own expert testimony was that the flexsteel hose could not have created the rupture in the casting. The examination of plaintiffs' expert Crankshaw (Appendix, page 657a) reveals:
 
 
 16
 'Q. Is it your testimony, then, that if the high pressure relief valve was clean, that the jerking of the hose on the morning of April 29, 1964, could not have ruptured the cover of the meter?
 
 
 17
 A. I think that is correct.'
 
 
 18
 Apart from this patently inconsistent position of plaintiffs, the testimony indicated that the Underwriter's Laboratories, the recognized testing agency in the trade,[7] had placed its stamp of approval on the use of the flexsteel hose with gasoline pumps and that the hose was in general use in the trade.[8] It was only during the progress of this case that experts retained by defendants to conduct experiments for trial testimony discovered the peculiar characteristics of diameter-contraction, pressure-accumulation present in the hose.
 
 
 19
 The test is one of foreseeability. The trial judge concluded that Humble could not have reasonably foreseen such characteristics and consequences; to reverse that conclusion would be tantamount to a declaration that it was foreseeable as a matter of law. This we cannot do. To hold that the defendants should have known in 1964 the idiosyncracies of the flexsteel hose which were not discovered by experts until 1967, is to ignore the realities of the case, namely, that the flexsteel hose was not a component of the pump as originally manufactured, that its use was initiated over nine years after the meter was sold and installed, that the defendants were neither manufacturers nor dealers in hoses, that the flexsteel hose had received the approval of the Underwriter's Laboratories, and that it was in general use in the trade. The Supreme Court's observation in Brady v. Southern Ry. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943) is apropos: 'Events too remote to require reasonable prevision need not be anticipated.' 320 U.S. at 483, 64 S.Ct. at 236.
 
 
 20
 There remains the question of the possible liability of both defendants under Section 402A of the Restatement of Torts 2d, adopted 'as the law of Pennsylvania' in Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).[9] Assuming that A. O. Smith Corporation, as successor to Erie Meter Systems, could be considered the 'seller' of the pump, it is clear that no liability can be imposed under Section 402A. An essential requirement for the imposition of such liability is that the product reach the ultimate user or consumer 'without substantial change in the condition in which it was sold'. The section specifically provides that a seller may not be held responsible for damages brought about by a modification of his product constituting a substantial change.
 
 
 21
 Nine years and seven months after the pump was sold, a new type hose, containing a steel wire braid component and capable of creating unusual pressure dynamics when violently stretched, replaced the type of hose ordinarily furnished with the pump. We hold that this was a substantial change in the condition of the product and that the doctrine of strict liability may not be applied to defendant A. O. Smith.
 
 
 22
 We now turn to defendant Humble, at whose direction the service contractor installed the flexsteel hose. Preliminarily, we must decide whether Humble can properly be classified as a 'seller' or moreover, 'a seller engaged in the business of selling such a product', within the provisions of Section 402A. If Humble is not such a seller, then no responsibility may attach under the doctrine of strict liability.[10]
 
 
 23
 The trial court concluded: 'The evidence showed that Humble was not in the business of selling pumps. It showed, on the contrary, that the pump in question was purchased by plaintiffs from Cemico and sold, still in place, to Humble who then leased it to plaintiffs. To find Humble liable under Section 402A because it furnished the pump assembly would thus be contrary to both the law and facts of the case.'[11] 275 F.Supp. at 868. We agree.
 
 
 24
 In an effort to overcome these findings, plaintiffs urge the application of 402A because the pump was a 'container' of Humble's product, gasoline.[12] This approach completely misconstrues the meaning of that term as it is used in the Restatement. A keg is certainly a container for beer;[13] a bottle is equally as much a container for beverages.[14] When the keg is considered with beer, and a bottle with beverages, the combinations are, in the view of the Restatement, 'purchased by the user or consumer as an integrated whole * * * the container cannot logically be separated from the contents when the two are sold as a unit.' The product and the actual container are considered as one unit when the test suggested by Professor Prosser is met: when the two are sold as an integrated whole, and it is inconceivable that anyone would buy one without the other.[15] We resist the inescapable conclusion to plaintiffs' argument that gasoline is packaged and marketed in pumps.
 
 
 25
 The trial court found that Humble was not a seller within the meaning of Section 402A. We concur in that conclusion. Because this finding is dispositive of the appeal, no further consideration of this issue is necessary.[16] Similarly, it does not become necessary for us to pass upon the issues of unitary enterprise and the exculpatory clause in the indemnification agreement which were raised in this appeal.
 
 
 26
 The judgment of the District Court will be affirmed.
 
 
 
 [1]
 Speyer, Inc. v. Humble Oil & Refining Co., 275 F.Supp. 861 (W.D.Pa.1967)
 
 
 [2]
 The reason for installing the new type hose was the inability of the regular hose to withstand the unusual wear-and-tear caused by the cab drivers' self-service filling station operation. There was evidence of five instances of damage to the pump hose by cab drivers prior to the switch to the new type
 
 
 [3]
 Section 402A of the Restatement of Torts 2d, adopted as the law of Pennsylvania in Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966), provides: '(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.'
 
 
 [4]
 See Hemrock v. Peoples Natural Gas Company, 423 Pa. 259, 223 A.2d 687 (1966); Pryor v. Chambersburg Oil and Gas Company, 376 Pa. 521, 103 A.2d 425 (1954); Foley v. Pittsburgh-Des Moines Company, 363 Pa. 1, 68 A.2d 517 (1949)
 
 
 [5]
 Citing Restatement of Torts 2d, Section 306, 'Effect of Third Person's Duty to Inspect'; Section 394, 'Chattel Known to be Dangerous'; Section 395, 'Negligent Manufacture of Chattel Dangerous Unless Carefully Made'; and Section 401, 'Chattel Likely to be Dangerous'. For the duty imposed on the manufacturer, see Evans v. General Motors Corp., 359 F.2d 822 (7 Cir. 1966); Gossett v. Chrysler Corp., 359 F.2d 84 (6 Cir. 1966); Guffie v. Erie Strayer Co., 350 F.2d 378 (3 Cir. 1965)
 
 
 [6]
 In his opinion, the trial judge states:
 'Defendants' theory of the case rests upon a fact given little weight by the plaintiffs. Noting that preceding each instance of casting fracture, the hose had been subjected to a violent jerk, Humble formulated the theory that it was the jerk, and not the inoperative valves, which caused ther casting fractures. Using a pump assembly and piping constructed to simulate the conditions which obtained at the Yellow Cab garage, defendants demonstrated to the Court that even in a properly maintained and cleaned pump assembly, with all valves thereby presumably operative, the meter head casting could be fractured simply by having a man stretch the hose to its full length and give it a sharp jerk. Defendants' experts explained this phenomenon by reference to the physical characteristics of the hose installed on the pump at the Yellow Cab garage and at the demonstrations. The hose, a Goodyear Flexsteel brand, is constructed of wire braid encased in rubber, which gives it greater strength and resistance to crushing, as when driven over by an automobile. As indicated, defendants' witnesses testified that this hose had been installed on the pump at the Yellow Cab garage because the abuse given other hoses had resulted in their being crushed and unsuitable for use. A peculiar characteristic of this hose, however, defendants' experts testified, was that because of the wire mesh construction, the bore of the hose, when stretched, tended to decrease at a rate greater than the length increased, resulting in a sharp reduction of volume and corresponding sharp increase in pressure, which, when transmitted back along the pipe to the meter head casting, caused the fracture.' 275 F.Supp. at 866-867.
 
 
 [7]
 Underwriters is a non-profit service organization sponsored by the National Board of Fire Underwriters. In addition to establishing standards for construction and performance, it tests the product to determine whether it meets such standards. When a product passes such testing, it is 'listed' in a publication which makes it available to the public
 
 
 [8]
 Evidence of common usage, custom or practice does not rule out negligence; it is nonetheless relevant to a determination of the standard of reasonable care and prudence to which the defendants are held. Forry v. Gulf Oil Corp., 428 Pa. 334, 237 A.2d 593 (1968); Donnelly v. Fred Whittaker Co., 364 Pa. 387, 72 A.2d 61 (1950)
 
 
 [9]
 Since the decision in Webb, the Pennsylvania Supreme Court has ruled on other aspects of Section 402A in Ferraro v. Ford Motor Co., 423 Pa. 324, 223 A.2d 746 (1966); Forry v. Gulf Oil Corp., supra, and Bialek v. Pittsburgh Brewing Co., 430 Pa. 176, 242 A.2d 231 (1968). In Ferraro the Court held that if the buyer knows of the defect and voluntarily and unreasonably proceeds to use it, he is precluded from recovery. Bialek emphasized that liability imposed under Section 402A is for selling the product and not for causing the defect. Thus, sellers in the distributive chain are equally as liable as the manufacturer who produced the defective product. In Forry, an equally divided court held that where the plaintiff alleged damages caused jointly by the use of a defective product and the active negligence of a third party, both elements of defective production and negligence must be established to impose liability on either
 Webb was decided on June 24, 1966, the same day as Miller v. Preitz, 422 Pa. 383, 221 A.2d 320. The concurring and dissenting opinions by Justice Jones and Justice Roberts set forth in elaborate detail the case law of Pennsylvania with respect to strict product liability where the action is contractual, based on breach of warranty resulting from a defect in the product. In interpreting the Uniform Commercial Code, Act of April 6, 1953, P.L. 3, 2-318, as amended by the Act of October 2, 1959, P.L. 1023, 2, 12A P.S. 2-318 (Supp., 1965), it was held that the right to recover in contract extended only to the immediate buyer of the product or those persons specifically described in the Code, and that, unless privity of contract (either factually or code-wise) be established, no right of recovery exists. Hochgertel v. Canada Dry Corp., 409 Pa. 610, 187 A.2d 575 (1963). This distinction between the liability of remote manufacturers based on whether the suit was brought in contract or tort was recently abandoned in Kassab v. Central Soya, Pa., 246 A.2 848 (1968). Specifically overruling the Miller case, the court held that: '* * * Pennsylvania should join the fast growing list of jurisdictions that have eliminated the privity requirement in assumpsit suits by purchasers against remote manufacturers for breach of implied warranty.'
 
 
 [10]
 A distinction must be drawn between the general liability of a 'supplier' of chattels, as set forth in Chapter 14 of the Restatement of Torts, which is grounded in negligence, and the specific liability of a 'seller', as contained in Section 402A, which is based on strict liability. Although Section 402A is located in Chapter 14, its comment 'a' clearly statutes that its inclusion is 'for convenience of reference and comparison with other sections dealing with negligence'. For example, Sections 407 and 408, specifically deal with the liability of 'lessors of chattels', and are based not on strict liability, but on general principles of negligence
 
 
 [11]
 Cf. Uniform Sales Act, Section 15, limiting the implied warranty of merchantable quality to one who deals in goods of that description; in Uniform Commercial Code Section 2-314, it is limited to a 'merchant'
 
 
 [12]
 Comment 'h' to Section 402A reads in part: 'No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole.'
 
 
 [13]
 Webb v. Zern, supra, note 3
 
 
 [14]
 Bialek v. Pittsburgh Brewing Co., supra, note 9
 
 
 [15]
 Prosser, The Fall of the Citadel, 50 MinnL.R. 791 (1966)
 
 
 [16]
 Had plaintiffs successfully surmounted the hurdle of concluding Humble to be a 'seller', they would then have been required to face the problem of whether the use of the hose by the cab driver driving the cab with the nozzle still inserted in the gas tank was 'normal handling' of the product as contemplated by Section 402A. See Comment 'h': 'A product is not in a defective condition when it is safe for normal handling and consumption.' See also Prosser, supra, note 15, where the author states:
 'There appears to be no reason to doubt that strict liability has made no change in the rule, well settled in negligence cases, that the seller of the product is not to be held liable when the consumer makes an abnormal use of it. Sometimes this has been put on the ground that the manufacturer has only assumed responsibility only for normal use; sometimes it has gone off on 'proximate cause."